**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KARUK TRIBE OF CALIFORNIA,

       Plaintiff,

  v.

UNITED STATES FOREST SERVICE, et al.,

       Defendants.

_____

No. C 04-4275 SBA

**ORDER**

[Docket Nos. 54, 59, 65]

     This matter comes before the Court on Plaintiff's Motion for Summary Judgment [Docket No. 54], Defendants' Motion to Strike Portions of Plaintiff's Declaration of Toz Soto [Docket No. 59], and the Miners' Motion for Miscellaneous Relief Concerning the Record [Docket No. 65]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby GRANTS Defendants' Motion to Strike Portions of Plaintiff's Declaration of Toz Soto, GRANTS IN PART and DENIES IN PART the Miners' Motion for Miscellaneous Relief Concerning the Record, and DENIES Plaintiff's Motion for Summary Judgment.

## BACKGROUND

### I. Factual and Regulatory Background.

### A. The Parties.

     Plaintiff Karuk Tribe of California ("Plaintiff" or the "Tribe") is a federally-recognized Indian Tribe located in Happy Camp, California. Second Amended Complaint ("SAC") ¶ 11. The Tribe has lived in northern California since time immemorial. Declaration of Leaf Hillman ("Hillman Decl.") at ¶ 3. The Tribe works to protect certain fish species and the water quality of the streams and rivers in the Klamath National Forest. *Id.* ¶ 12. A primary concern of the Tribe is the protection and restoration of native fish and wildlife species that the Tribe has depended upon for traditional, cultural, religious, and subsistence uses. Hillman Decl. ¶ 3. The center of the Karuk world is Katimin, where the Salmon River meets the Klamath River. *Id.*

United States District Court

For the Northern District of California

1  Defendant United States Forest Service ("Forest Service") is an agency of the United States

2  Department of Agriculture. *Id.* ¶ 16.  Defendant Margaret Boland is the Supervisor for the Klamath National

3  Forest.  *Id.*  The Forest Service is responsible for implementing all laws and regulations relating to the

4  management of the Klamath National Forest. *Id.* ¶ 16.

5  Intervenor the New 49'ers, Inc. (the "New 49'ers") is a California corporation with a principal place

6  of business in Happy Camp, California.  Miners' Answer to Second Amended Complaint ("Miners' Answer")

7  ¶ 3.  The New 49'ers own or control numerous mining claims in a 60-mile area surrounding the Salmon,

8  Klamath, and Scott Rivers.  SAC ¶¶ 36-37.  The New 49'ers also leases many of its mining claims located

9  along these rivers to its members.  Miners' Answer ¶ 3.  Intervenor Raymond W. Koons ("Koons") is an

10  individual who resides in Happy Camp.  *Id.*  He is also the owner of several unpatented mining claims located

11  around the Klamath River.  *Id.*  Koons leases his mining claims to the 49'ers (the New 49'ers and Koons are

12  collectively referred to herein as the "Miners").  *Id.*

13  **B.    The Applicable Mining Regulations.**

14  Mining in national forests is governed by the General Mining Law of 1872 ("General Mining Law"),

15  which confers a statutory right upon citizens to enter certain public lands for the purpose of prospecting.  *See*

16  30 U.S.C. § 22, *as amended by* 30 U.S.C. § 612 (the "Surface Resources Act of 1955").  Pursuant to the

17  General Mining Law, "Except as otherwise provided, all valuable mineral deposits in lands belonging to the

18  United States . . . shall be free and open to exploration and purchase."  *Id.*

19  The application of the General Mining Law to national forests was specifically affirmed by Congress

20  in the Organic Act, 16 U.S.C. §§ 478 *et seq.*, which makes the national forests "subject to entry under the

21  existing mining law of the United States and the rules and regulations applying thereto." *See* 16 U.S.C. § 482;

22  *see Wilderness Soceity v. Dombeck*, 168 F.3d 367, 374 (9th Cir. 1999).  The Organic Act allows the

23  Secretary of Agriculture to make rules regulating the "occupancy and use [of national forest land] and to

24  preserve the forests thereon from destruction."  16 U.S.C. § 551.  However, the Organic Act also expressly

25  states that it "shall [not] be construed as prohibiting . . . any person from entering upon such national forests for

26  all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources

27  thereof."  16 U.S.C. § 478.

28

2

1    In 1974, pursuant to the Organic Act, the Forest Service promulgated regulations governing the use

2    of surface resources in connection with the mining activities on national forests.  *See* 39 Fed. Reg. 31317 (Aug.

3    28, 1974) (presently codified as amended at 36 C.F.R. Part 228, subpart A (referred to herein as the "Part

4    228 regulations")).  Before the Forest Service issued the final regulations, the House Committee on Interior and

5    Insular Affairs, Subcommittee on Public Lands (the "Subcommittee") held oversight hearings and heard

6    testimony from the Chief of the Forest Service and representatives from both the mining and environmental

7    communities.  *Id.*  Following these hearings, the Subcommittee chairman wrote the Chief of the Forest Service

8    and stated that "the 1897 [Organic] Act clearly cannot be used as authority to prohibit prospecting, mining, and

9    mineral processing" in national forests.  *See* Letter from Rep. John Melcher to John McGuire, Forest Service

10   Chief (June 20, 1974), reproduced in S. Dempsey, *Forest Service Regulations Concerning the Effect of*

11   *Mining Operations on Surface Resources,* 8 Nat. Res. Law 481, 497-504 (1975).  He further urged that

12   the final regulations be reasonable and not "extend further than to require those things which preserve and

13   protect the National Forests from needless damage by prospectors and miners."  *Id.*  The Subcommittee

14   chairman also specifically expressed concerns regarding "the possibility of unreasonable enforcement of the

15   regulations, with resulting cost increases that could make otherwise viable mineral operations prohibitively

16   expensive."  39 Fed. Reg. 31317.

17   Due to the Subcommittee's concerns, the chairman ultimately recommended the adoption of a "simple

18   notification procedure" that would enable the Forest Service to determine whether the miner would be required

19   to submit a more comprehensive plan of operation ("PoO") before proceeding with mining operations.  8 Nat.

20   Res. Law at 500.  As the chairman explained:

> An effort [should] be made to define more precisely what sort of prospecting would
> be excepted from the requirement to file operating plans.  The National Wildlife
> Federal, the American Mining Congress, and the Idaho Mining Association[] all
> seem to agree that prior notification of proposed operations is a reasonable
> requirement.  The Subcommittee therefore recommends that the Forest Service
> provide a simple notification procedure in any regulations it may issue.  The objective
> in so doing would be to assist prospectors in determining whether their operations
> would or would not require the filing of an operating plan.  Needless uncertainties
> and expense in time and money in filing unnecessary operating plans could be
> avoided thereby.

27   *Id.*

28

3

United States District Court

For the Northern District of California

In response, the Forest Service stated that it "recognize[d] that prospectors and miners have a statutory right, not mere privilege, under the 1872 mining law and the Act of June 4, 1897, to go upon and use the open public domain lands of the National Forest System for the purposes of mineral exploration, development and production." 39 Fed. Reg. 31317. The Forest Service also acknowledged that "[e]xercise of that right may not be unreasonably restricted." *Id.* To address the Subcommittee's concerns, the Forest Service adopted a final rule that included a provision for notices of intent ("NOIs"). The Forest Service also noted that a "specific provision [was] made in the operating plan approval section of the regulations [that] charg[ed] Forest Service administrators with the responsibility to consider the economics of operations, along with the other factors, in determining the reasonableness of the requirements for surface resource protection." *Id.* In accordance with the National Environmental Policy Act, a Final Environmental Impact Statement was prepared and filed that discussed the environmental impact of the regulations. *Id.*

The regulations, as originally promulgated, provided that, with certain exceptions, "a notice of intention to operate [would be] required from any person proposing to conduct operations which might cause disturbance of surface resources." 39 Fed. Reg. 31317. They further provided that, "[i]f the District Ranger determines that such operations will likely cause significant disturbance of surface resources, the operator [would be required to] submit a proposed plan of operations to the District Ranger." *Id.* Additionally, the regulations provided that the "requirements to submit a plan of operations [would] not apply . . . to individuals desiring to search for and occasionally remove small mineral samples or specimens [or] to prospecting and sampling which will not cause significant surface resource disturbance" and that a "notice of intent need not be filed . . . for operations which will not involve the use of mechanized earthmoving equipment such as bulldozers or backhoes and will not involve cutting of trees." *Id.* at 36 C.F.R. § 252.4(a)(2).[1] All persons entering national forests for mining purposes were required to comply with the regulations after their promulgation. *See* 16 U.S.C. § 482.

---

[1]The current regulations are now set forth at 28 C.F.R. Part 228, subpart A.

United States District Court

For the Northern District of California

**C.      The Northwest Forest Plan.**

In 1994, the Secretaries of the Interior and Agriculture issued the Record of Decision for Amendments to Forest Service and Bureau of Land Management ("BLM") Planning Documents Within the Range of the Northern Spotted Owl, commonly known as the Northwest Forest Plan.  The Northwest Forest Plan (or "NFP") amended the forest plans for numerous national forests, including the Klamath National Forest.  In July 1995, the Klamath Forest issued a new forest plan, referred to as the Klamath Forest Plan, which incorporated elements of the NFP.[2]

The Northwest Forest Plan is a common approach to managing about 24 million acres of federal land within the range of the northern spotted owl across the Pacific Northwest.  *See* Record of Decision for Northwest Forest Plan at 1-2.  It consists of an extensive system of standards and guidelines[3] and land use allocations designed to balance extractive uses, such as mining, with considerations for wildlife species.  *Id.* at 7, 12.  One land use allocation in the Northwest Forest Plan is known as the "Riparian Reserves" (or "RRs").  *Id.* at 7.  Riparian Reserves include "areas along all streams, wetlands, ponds, lakes, and unstable or potentially unstable areas where the conservation of aquatic and riparian-dependent terrestrial resources receives primary emphasis."  *Id.*  Riparian Reserves are intended to "protect the health of the aquatic system and its dependent species" by maintaining and restoring riparian structure and function.  *Id.*

It is explicitly stated in the Northwest Forest Plan that the standards and guidelines "do not apply where they would be contrary to existing law or regulation, or where they would require the agencies to take actions for which they do not have authority."  *See* Attachment A to the Record of Decision.  One of the Northwest Forest Plan standards and guidelines governing mineral management is MM-1, which requires, among other things, an approved Plan of Operation ("PoO") for all minerals operations that include areas designated as RRs.  *Id.*  This guideline is incorporated into the forest plan for the Klamath National Forest as standard MA 10-34.

**D.      The Forest Service's Interpretation of the Northwest Forest Plan.**

_____

[2]Although the Northwest Forest Plan was technically superseded by the new forest plan, the term "NFP" is still used to refer to the conservation strategy incorporated into the Klamath National Forest Plan.

[3]Standards and guidelines are the "rules and limits governing actions, and the principles specifying the environmental conditions or levels to be achieved and maintained in managing specific lands." *See* Attachment A to the Record of Decision.  In essence, they are conditions which apply either forestwide or to specific land use allocations within a national forest.  *Id.*

1    In 1995, the Regional Foresters issued a memorandum clarifying how the Part 228 mining regulations

2    should be applied to the standard and guidelines addressing mining within RRs.  AR 212-213.[4]  In that

3    memorandum, the Regional Foresters noted that there were "numerous, small placer operations using suction

4    dredges[5] and similar equipment occurring in RR's and [late successional reserves] throughout Regions 5[6] and

5    6," the majority of which would not require PoOs due to the "insignificant nature of their operation."  AR 212.

6    The memorandum further stated that, since mining was lawfully conducted under NOIs, the stricter standards

7    and guidelines applicable to mining in RRs would not apply, since "there is no regulatory provision for including

8    [the standards and guidelines] in an NOI."  AR 213.

9    In February 2002, the Forest Service issued another memorandum again clarifying the regulation of

10   mining within RRs.  AR 216.  It explained that requiring a PoO for mining that does not cause a significant

11   disturbance of surface resources would be inappropriate and "contrary to law and regulation."  AR 216.  The

12   memorandum further explained that:

13           If no significant surface disturbance is occurring, we have no reason to require a
             reclamation bond, nor would we be able to determine that bond amount.
14
             In areas covered by the Northwest [Forest] Plan . . . or covered by other general
15           management guidance or strategies, forest users can conduct non-significant surface
             disturbing activities without filing plan of operations per the intent of the Forest
16           Service Mining Regulations.  A Notice of Intent to Operate (NOI) will still be
             required if the proposed activity might cause disturbance of surface resources and
17           it doesn't meet the provisions of 36 CFR 228.3(a)(2).

18   Id.  The Forest Service thus concluded that, to be consistent with 36 C.F.R. § 228.4(a), PoOs would only be

19   required in RRs where proposed mining would likely cause significant surface resource disturbances.  AR 216-

20   217.

21   In a 2004 memorandum, the Regional Forester for Region 5 reiterated that the requirement to submit

22

23

24           [4]The administrative record is referred to herein as "AR."

25           [5]Suction dredge mining is a "popular, relatively low cost mining method."  AR 418.  In suction dredge
     mining, the "gravel within the active stream channel is suctioned from the bottom of the stream and processed
26   over a sluice on a floating platform."  Id.  A "gasoline powered motor and pump are mounted on the floating
     platform for powering the suction apparatus and for driving the air pump which supplies air to the persons
27   working underwater."  Id.  The size of dredges used in California "ranges from 2-inches [to] up to 10-inches
     or more."  Id.

28           [6]Region 5 encompasses California.  See 36 C.F.R. § 200.2(e).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  a PoO in RRs would apply "only when the proposed activity is likely to cause significant surface resource

2  disturbance." AR 219.  The 2004 memorandum further stated that if the District Ranger concludes that a PoO

3  is not required, then "there is no decision and, hence, no federal action" to trigger the National Environmental

4  Protection Act ("NEPA") or the Endangered Species Act ("ESA") for the Forest Service."  AR 219.  The

5  memorandum also acknowledged that PoOs would be subject to the requirements of NEPA and the ESA.

6  *Id.*

7  **E.     Amendments to the Mining Regulations.**

8         On July 9, 2004, in response to a decision of the United States District Court of the Eastern District

9  of California in *United States v. Lex*, 300 F.Supp.2d 951 (E.D. Cal. 2003), the Forest Service decided to

10  amend the mining regulations in order to further clarify the Forest Service's position with respect to how 36

11  C.F.R. § 228.4(a) should be interpreted.  *See* 70 Fed. R. 32713.  The interim rule, which was published in the

12  Federal Register, took effect on August 9, 2004.  *See id.* at 32714.  The interim rule stated that it was

13  specifically intended to clarify that "the requirement to file a notice of intent to operate with the District Ranger

14  is mandatory in any situation in which a mining operation might cause disturbance of surface resources,

15  regardless of whether that operation would involve the use of mechanized earth moving equipment, such as

16  bulldozer or backhoe, or the cutting of trees." *Id.*  "The interim rule also sought to eliminate possible confusion

17  by more specifically addressing the issue of what level of operation requires prior submission of a notice of

18  intent to operate and what level of operation requires prior submission and approval of a plan of operations."

19  *Id.*  Although it was not required to, the Forest Service provided the public with a 60-day comment period and

20  stated that comments received on the interim rule would be considered in adopting a final rule.  *Id.*

21         During the comment period, the Forest Service received a request that the new regulation include a

22  provision exempting mining activities using only "small portable suction dredges, such as those with an intake

23  of four inches or less" from the requirement to submit an NOI or PoO.  *Id.* at 32720.  The respondent who

24  submitted the request indicated that "various studies, including those by the United States Environmental

25  Protection Agency, the Department of Interior, United States Geological Survey, and the State of Alaska

26  Department of Natural Resources, have shown that these dredges do not cause significant disturbance of

27  streams or rivers." *Id.*  The respondent further stated that "such a provision would [also] be consistent with the

28

recommendations of the National Academy of Sciences, National Research Council's 1999 report entitled,

'Hardrock Mining on Federal Lands.'" The Forest Service declined to add such a provision to the final rule,

but noted that:

> The environmental impacts of operating suction dredges, even small ones, are highly site-specific depending on the circumstances and resource conditions involved. The environmental impacts of using a suction dredge on two bodies of water which are otherwise similar can vary greatly if a threatened or endangered specie inhabits one body of water but not the other. Even with respect to a particular body of water, the environmental impacts of suction dredge operations can vary by season due to climatic conditions or the life cycles of aquatic species. Given this variability, the Department believes that, insofar as suction dredge operations are concerned, the need for the prior submission of a notice of intent to operate or for the prior submission and approval of a proposed plan of operations must be evaluated on a site-specific basis. While the operation of suction dredges with intakes smaller than four inches may not require either a notice of intent to operate or an approved plan of operations in many cases, the prior submission of a notice of intent to operate will be required in some cases, and the prior submission and approval of a proposed plan of operations will be required in fewer cases.

*Id.* at 32720.

The final rule was adopted by the Forest Service and published in the Federal Register on June 6, 2005. As amended, 28 C.F.R. 228.4 now reads in pertinent part:

> § 228.4 Notice of intent--plan of operations--requirements.
>
> (a) Except as provided in paragraph (a)(1) of this section, a notice of intent to operate is required from any person proposing to conduct operations which might cause significant disturbance of surface resources . . . . Each notice of intent to operate shall provide information sufficient to identify the area involved, the nature of the proposed operations, the route of access to the area of operations, and the method of transport.
>> (1) A notice of intent to operate is not required for:
>>> (i) Operations which will be limited to the use of vehicles on existing public roads or roads used and maintained for National Forest System purposes;
>>> (ii) Prospecting and sampling which will not cause significant surface resource disturbance and will not involve removal of more than a reasonable amount of mineral deposit for analysis and study which generally might include searching for and occasionally removing small mineral samples or specimens, gold panning, metal detecting, non-motorized hand sluicing, using battery operated dry washers, and collecting of mineral specimens using hand tools;
>>> (iii) Marking and monumenting a mining claim;
>>> (iv) Underground operations which will not cause significant surface resource disturbance;
>>> (v) Operations, which in their totality, will not cause surface resource disturbance which is substantially different than that caused by other users of the National Forest System who are not required to obtain a Forest Service special use authorization, contract, or other written authorization;
>>> (vi) Operations which will not involve the use of mechanized earthmoving equipment, such as bulldozers or backhoes, or the cutting of trees,

8

United States District Court

For the Northern District of California

unless those operations otherwise might cause a significant disturbance of surface resources; or

                (vii) Operations for which a proposed plan of operations is submitted for approval;

       (2) The District Ranger will, within 15 days of receipt of a notice of intent to operate, notify the operator if approval of a plan of operations is required before the operations may begin.

. . .

       (4) If the District Ranger determines that any operation is causing or will likely cause significant disturbance of surface resources, the District Ranger shall notify the operator that the operator must submit a proposed plan of operations for approval and that the operations can not be conducted until a plan of operations is approved.

28 C.F.R. § 228.4 (June 6, 2005).

**F.      The 2004 Mining Season.**

On or about February 1, 2004, Rangers and staff from the Klamath, Six Rivers, and Shasta Trinity National Forests met to discuss issues relevant to the upcoming mining season. AR 110. One of the issues discussed was suction dredging and whether the Rangers should develop a template to be used in the evaluation of NOIs. *Id.* On February 4, 2004, the Rangers conducted a meeting with representatives from the New 49'ers in order to evaluate issues surrounding the New 49'ers mining operations. AR 112.

On March 22, 2004, members of the Forest Service met with the Karuk Tribe and the New 49'ers to discuss potential issues for the upcoming dredging season. AR 109. A representative from the Karuk Tribe indicated that the Tribe was concerned about the effects of suction dredge operations on the Salmon River. *Id.* The Karuk Tribe representative also expressed concern regarding the New 49'ers potential interference with certain areas of ceremonial import to the Tribe. AR 109.[7] The attendees of the meeting agreed to reconvene on April 20, 2004 or April 21, 2004 to further discuss potential impacts of suction dredging on fisheries. *Id.*

During this time, the Happy Camp Ranger, Alan Vindiver ("Vindiver"), was working with two Forest Service biologists, Jon Grunbaum ("Grunbaum") and Bill Bemis ("Bemis"), to develop standards for determining when proposed operations in the Klamath Forest were likely to cause significant surface disturbances, thereby requiring a PoO. AR 095. As part of this process, Vindiver reviewed an April 20, 2004 report prepared by

---

[7]As a result of this meeting with the Karuk Tribe, and due to the Karuk Tribe's concerns, the New 49'ers eventually withdrew their Notice of Intent to mine for gold on the lower Salmon River. AR 041.

Grunbaum, a United States Forest Service Fisheries Biologist for the mid-Klamath and Salmon River regions. AR 095.  Grunbaum's report noted that "[r]elatively few studies have examined the effects of suction dredging and related activities on riparian and aquatic habitats, and on fish and other aquatic organisms," and that "[t]he majority of the studies show[] that suction dredging can adversely affect aquatic habitats and biota." AR 294. Grunbaum's report also noted that a United States Forest Service technical team had reviewed information on potential suction dredging effects on fisheries in 1998 and concluded that, "[i]n some situations, the effects of a dredging may be local and minor, particularly when compared to the effects of other human activities . . . [while, in] other [situations], dredging may harm the population viability of threatened species." *Id.*

Vindiver also received input from Bemis, another District Fisheries biologist.  AR 095.  Vindiver observed that Bemis' opinions "varied widely [from Grunbaum's] on the effect of dredge operations on fisheries." *Id.*  After considering the opinions of both Grunbaum and Bemis, Vindiver identified three key issues regarding fisheries, which he set forth in an internal Forest Service memorandum.  AR 095.  First, he identified twenty-two cold water refugia on the Klamath River used by fish when river temperatures are high, in which dredging might impact fish.  AR 097-105.  Second, Vindiver developed threshold dredging levels (*e.g.* ten dredges per mile on the Klamath River and three dredges per mile on tributary streams) which he felt would not lead to a significant disturbance of surface resources.  AR 095, AR 108.  Finally, he concluded that tailing piles should be raked back into dredge holes to protect spawning gravel on Elk Creek. *Id.*  These recommendations were discussed in an open forum with potential miners.  AR 091, AR 096.  Vindiver's findings were also summarized in a comprehensive set of internal guidelines.  AR 097-105.  A shorter summary of Vindiver's findings was circulated to potential miners.  AR 091.

On May 17, 2004, members of the Forest Service met with members of the Karuk Tribe and the New 49'ers to further discuss potential fisheries issues associated with the upcoming dredge season.  AR 106.  At the meeting, Vindiver identified the three key issues that needed to be addressed in all NOIs: (1) cold water refugia areas on the Klamath River; (2) stability of coho spawning gravels in a portion of Elk Creek, and (3) the number of dredges per mile of stream.  AR 106.  With respect to the first issue, Vindiver identified twenty discrete areas of cold water refugia where dredging would not be permitted between June 15, 2004 and October 15, 2004.  AR 106.  Vindiver also stated that all dredge trailings would have to be raked back into

10

United States District Court

For the Northern District of California

1    dredge holes by the end of the season.  AR 107.  Finally, Vindiver set up a threshold dredge intensity level of

2    "10 dredges per mile on the Klamath River" and "no more than three dredges per mile on Klamath tributaries."

3    AR 108.  Vindiver concluded that "this level of intensity would not lead to a significant disturbance of the

4    surface resource."  *Id.*

5            **1.**      **The New 49'ers Notice of Intent.**

6          On May 24, 2004, the New 49'ers submitted an NOI to conduct operations within the Happy Camp

7    Ranger District.  AR 031-040.  The NOI indicated that the level of dredging activity would involve "a daily

8    average of 10 active suction dredges out of approximately 40 dredges disbursed throughout 35 miles of stream

9    course between the months of May through mid-September."  AR 033.  The NOI also indicated that the

10   average amount of material moved per dredge was estimated to be around 1/4 yard, that no operations would

11   occur within 500 feet of numerous cool water refugia, and that dredge holes would be back-filled to replicate

12   the original contour of the streambed.  AR 033-34.  The NOI further stated that large mechanized equipment,

13   such as backhoes and bulldozers, would not be used, and instead proposed a very limited use of hand tools

14   outside the stream but with the mean high water channel.  AR 035.  On May 25, 2005, the Ranger notified the

15   49'ers that they would not need to submit a PoO.  AR 029.

16           **2.**      **Nida Johnson's Notice of Intent.**

17         On May 29, 2004, Nida Johnson submitted an NOI to conduct suction dredging on several claims in

18   the Happy Camp Ranger District.  AR 069.  The NOI indicated that no mechanized earthmoving equipment

19   would be used, that no trees would be cut, that all dredge tailings would be leveled, and that no dredging would

20   be conducted within 500 feet above or below the mouth of Independence Creek.  AR 069-070.  On June 14,

21   2004, the Forest Service informed Johnson that he would not need to submit a PoO.  AR 067.

22           **3.**      **Robert Hamilton's Notice of Intent.**

23         On June 2, 2004, Robert Hamilton submitted an NOI indicating that he would be performing suction

24   dredge mining for twelve days, from July 12, 2004 to July 23, 2004, between the hours of 9:30 a.m. and 3:30

25   p.m.  AR 075.  The NOI also indicated that Hamilton would be using a pan, shovel, and a 4-inch suction hose

26   with a 2.5-inch nozzle.  AR 075.  It further stated that "[u]p to 20 cu[bic] y[ar]ds of material could be moved

27   down to a depth of approx[imately] 6 f[ee]t or bedrock, whichever comes first" and that all "tailings will be

28

1    returned to a dredge hole if possible in shallow areas or spread over large area in deep areas." AR 076. On

2    June 15, 2004, the Ranger informed Hamilton that he would not need to submit a PoO. AR 074.

3              **4.      Ralph Easley's Notice of Intent.**

4              On June 14, 2004, Ralph Easley submitted an NOI indicating that he intended to perform suction

5    dredging at his one mining claim from July 1, 2004 to September 30, 2004. AR 082. The NOI further

6    indicated that two people would be using a 4-inch dredge hose and other assorted hand tools, but that

7    mechanized earth-moving equipment would not be used. *Id.* It also stated that all dredge tailings would be

8    raked back into dredge holes. *Id.* On June 15, 2004, the Forest Service informed Easley that he would not

9    need to submit a PoO. AR 081.

10             **5.      The Forest Service's Subsequent Monitoring of Suction Dredge Activities.**

11             Throughout the summer of 2004, the Forest Service – often in conjunction with a representative of the

12   Karuk Tribe – monitored the activities taking place within the Forest to evaluate compliance with the NOIs.

13   AR 087. For example, on June 8, 2004, Vandiver floated the Klamath River with the River Ranger and the

14   Deputy Forest Supervisor to monitor compliance with the NOIs. AR 090. On June 15, 2004, Vandiver also

15   consulted with a member of the Karuk Tribe to discuss a monitoring strategy for the dredge season. AR 088.

16   Further, on June 23, 2004, a member of the Forest Service monitored a number of mining operations with a

17   member of the Karuk Tribe. AR 087. The Tribe continued to participate in the Forest Service's monitoring

18   trips in September. AR 085.

19

20   **II.    Procedural Background.**

21             On October 8, 2004, Plaintiff filed a Complaint for Declaratory and Injunctive Relief against the United

22   States Forest Service, Jeff Walters,[8] and Margaret Boland (collectively, "Defendants"). On October 15, 2004,

23   Plaintiff filed an Amended Complaint for Declaratory and Injunctive Relief ("Amended Complaint"). Pursuant

24   to a stipulation between the parties, Plaintiff's Amended Complaint was dismissed without prejudice on January

25   24, 2005.

26             On January 31, 2005, Plaintiff filed a Second Amended Complaint. Plaintiff's Second Amended

27

28             [8]Jeff Walters is the Forest Supervisor for the Six Rivers National Forest.

United States District Court

For the Northern District of California

1   Complaint seeks declaratory and injunctive relief arising from Defendants' allegedly improper management of

2   suction dredge and other mining operations in waterways and riparian areas within the Klamath National Forest.

3   *Id.* ¶ 1.   The Second Amended Complaint challenges four Forest Service decisions allowing suction dredge

4   and other mining operations to occur pursuant to a Notice of Intent instead of a Plan of Operation: (1) the New

5   49'ers NOI; (2) the Johnson NOI; (3) the Hamilton NOI; and (4) the Easley NOI.  *Id.* ¶ 2.[9]

6       The Second Amended Complaint alleges violations of the following statutes: (1) the National Forest

7   Management Act ("NFMA"); (2) the National Environmental Policy Act ("NEPA"); and (3) the Endangered

8   Species Act ("ESA").[10]  *Id.* ¶¶ 94-127.  Plaintiff asserts jurisdiction under the Administrative Procedure Act

9   ("APA") and the citizen suit provision of the ESA.  *Id.* ¶ 8.

10      On March 1, 2005, the New 49'ers and Koons (hereinafter the "Miners") filed a Motion to Intervene.

11  On April 26, 2005, the Court granted the Miners' Motion to Intervene.  On April 29, 2005, Plaintiff filed the

12  instant Motion for Summary Judgment.

13                          **LEGAL STANDARD**

14  **I.    Summary Judgment.**

15      The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings,

16  depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there

17  is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

18  Fed. R. Civ. P. 56(c).

19      In considering a motion for summary judgment, the court must examine all of the evidence in the light

20

21

22      [9]Initially, the Second Amended Complaint also challenged five instances in which the Forest Service
    required a miner to submit a PoO, but allegedly failed to comply with the additional requirements triggered by
23  the PoO approval process.  *Id.* ¶ 3.  These allegations, and Defendant Jeff Walters, were dismissed from the
    lawsuit pursuant to a stipulation between the parties.

24      [10]The Second Amended Complaint also asserts causes of action for (1) violations of the Organic Act
    and the Forest Service's mining regulations; (2) violations of the Clean Water Act; and (3) violations of the
25  Organic Act's special use regulations.  However, in Plaintiff's Motion for Summary Judgment, Plaintiff states
    that it is not moving for summary judgment on these causes of action and requests that the causes of action be
26  "excised from the case."  The Court construes this request as a motion to amend the Second Amended
    Complaint such that the fifth, sixth, and eighth causes of action are dismissed from the case without prejudice.
27  *See Hells Canyon Preservation Council v. United States Forest Service*, 403 F.3d 683, 689-90 (9th Cir.
    2005).  Accordingly, Plaintiff's request is GRANTED and Plaintiff's fifth, sixth, and eighth causes of action are
28  hereby DISMISSED WITHOUT PREJUDICE.

                                    13

1  most favorable to the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  If the

2  moving party does not bear the burden of proof at trial, he or she may discharge his burden of showing that no

3  genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the

4  non-moving party's case."  *Celotex Corporation v. Catret*, 477 U.S. 317, 325 (1986).  Once the moving

5  party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving

6  party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that

7  there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

8      Where, as here, the Court's review is limited to the administrative record, stipulated to by the parties,

9  there are no triable issues of fact, and summary judgment is appropriate.  *See Northwest Motorcycle Ass'n*

10  *v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1472 (9th Cir.1994).

11  **II.**     **Administrative Procedure Act.**

12      The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because

13  of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute,

14  is entitled to judicial review thereof."  5 U.S.C. § 702.

15      The APA limits the scope of judicial review of agency actions.  Generally, a court may not set aside

16  an agency action unless that action was "arbitrary and capricious, an abuse of discretion, or otherwise not in

17  accordance with the law." 5 U.S.C. § 706(2)(A).  "To make this finding, the court must consider whether the

18  decision was based on a consideration of the relevant factors and whether there has been a clear error of

19  judgment." *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  "Although this inquiry

20  into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not

21  empowered to substitute its judgment for that of the agency." *Id.*  "This is especially appropriate where, as

22  here, the challenged decision implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy*, 986

23  F.2d 1568, 1571 (9th Cir. 1993) ("Deference to an agency's technical expertise and experience is particularly

24  warranted with respect to questions involving . . . scientific matters").

25      In determining whether an agency's actions were arbitrary, capricious, an abuse of discretion, or

26  otherwise not in accordance with the law, "the court shall review the whole record or those parts of it cited by

27  a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706.  "The focal point for

28

United States District Court

For the Northern District of California

judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985).  "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."  *Id.* at 743-44.  A court may not consider information "that was not available at the time the [agency] made its decision."  *Airport Cmty. Coalition v. Graves*, 280 F. Supp. 2d 1207, 1213 (W.D.Wash.2003).  "If the court were to consider this new information in an arbitrary and capricious analysis, the court would effectively transform that analysis into de novo review, a level of review for which the court is not authorized."  *Id.*

## ANALYSIS

**I.      The Administrative Record.**

As a preliminary matter, the parties seek to include, and exclude, certain materials that are not part of the stipulated administrative record.  Specifically, Plaintiff seeks to include the following documents: (1) excerpts from the Klamath National Forest Land and Resource Management Plan; (2) a December 2001 Draft Environmental Impact Statement for the Siskiyou National Forest; and (3) an April 24, 2000 letter from the Acting Forest Supervisor for the Siskiyou National Forest.[11]   Additionally, Plaintiff has submitted the Declaration of Toz Soto ("Soto Declaration") and the Declaration of Leaf Hillman ("Hillman").  In support of their Opposition brief, Defendants seek to include the following documents: (1) excerpts from the Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl ("Record of Decision"); (2) Attachment A to the Record of Decision; (3) excerpts from the Final Environmental Impact Statement and Land and Resource Management Plan for Six Rivers National Forest; (4) excerpts from Chapter 4 of the Klamath National Forest Land and Resource Management Plan; (5) a copy of Volume 8 of *Natural Resources Lawyer*; and (6) a copy of the originally promulgated Part 228 mining regulations, as published in the Federal Register.[12]   In support of their Opposition brief, the Miners have submitted the Declaration of Joseph C. Greene ("Greene Declaration"), the Declaration

---

[11]These documents were submitted to the Court as exhibits to Plaintiff's Motion for Summary Judgment.

[12]These documents were submitted to the Court as exhibits to Defendants' Opposition to Plaintiff's Motion for Summary Judgment.

United States District Court

For the Northern District of California

1   of Dennis Maria ("Maria Declaration"), and the Declaration of David McCracken ("McCracken Declaration").

2   The Miners also seek to supplement the record with the following documents, which are attached to the

3   Declaration of James L. Buchal ("Buchal Declaration"): (1) a copy of the Forest Service Manual; (2) a copy

4   of the Forest Service Handbook; (3) a Forest Service report entitled "The Process Predicament"; (4) a copy

5   of the Declaration of Thomas Kitchar, President of the Waldo Mining District; (5) the transcript of the

6   proceedings in *California State Grange v. Dept. of Commerce*, USDC CV 02-6044, January 11, 2005;

7   and (6) a copy of the 1974 Environmental Impact Statement prepared in connection with the promulgation of

8   the Part 228 mining regulations.

9        The Ninth Circuit allows a reviewing court to consider extra-record materials in an APA case only

10  under four narrow exceptions: (1) when it needs to determine whether the agency has considered all relevant

11  factors and has explained its decision; (2) when the agency has relied upon documents or materials not included

12  in the record; (3) when it is necessary to explain technical terms or complex matters; and (4) when a plaintiff

13  makes a showing of agency bad faith. *Southwest Center for Biological Diversity v. United States Forest

14  Service*, 100 F.3d 1443, 1450 (9th Cir. 1996). For extra-record material to be considered, a plaintiff must

15  first make a showing that the record is inadequate. *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1437

16  (9th Cir. 1988) ("The [plaintiff] makes no showing that the district court needed to go outside the administrative

17  record to determine whether the [agency] ignored information"). At the same time, "[a] satisfactory explanation

18  of agency action is essential for adequate judicial review, because the focus of judicial review is not on the

19  wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took

20  into consideration all the relevant facts." *Asarco, Inc. v. U.S. Environmental Protection Agency*, 616 F.2d

21  1153, 1160 (9th Cir. 1980).

22       **A.    Defendants' Motion to Strike the Soto Declaration.**

23            **1.    Paragraph 9 and Exhibit 1 of the Soto Declaration.**

24       In their Motion to Strike, Defendants move to strike paragraph 9 and Exhibit 1 of the Soto Declaration

25  on the grounds that such materials do not fall within any of the recognized exceptions to the general rule that

26  the Court may not consider extra-record declarations in an APA review. Defendants also argue that paragraph

27  9 and Exhibit 1 contain inadmissible opinion testimony. In response, Plaintiff argues that the Soto Declaration

28

is admissible and necessary to establish the Karuk Tribe's standing.

Plaintiff is correct that extra-record declarations may be used and, indeed, are required at the summary judgment stage to establish standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (noting that, at the summary judgment stage, a plaintiff "must set forth by affidavit or other evidence specific facts" to demonstrate standing). Although neither Defendants nor the Miners have contested Plaintiff's standing, to the extent that the Soto Declaration serves to establish standing, it is permissible. *Id.* However, as Defendants correctly note, paragraph 9 of the Soto Declaration contains several purportedly factual statements that go beyond Plaintiff's need to establish standing. Specifically, in paragraph 9 of the Soto Declaration, Mr. Soto makes certain statements regarding the effects of suction dredging operations. *See* Soto Decl. ¶ 9. Similarly, Exhibit 1 to the Soto Declaration is a four-page white paper prepared by Mr. Soto that summarizes Mr. Soto's personal observations and opinions regarding "the negative impacts from section dredging." *See* Soto Decl. at Ex. 1. There is no evidence before the Court that Mr. Soto's opinions were considered by the Forest Service before making the decisions challenged in this action and Plaintiff has not shown that such information should be part of the administrative record.

Moreover, the Court agrees with Defendants that Plaintiff has not established that Mr. Soto is an expert qualified to offer testimony concerning scientific, technical, or other specialized matters of expertise. *See* Fed. R. Evid. 701, 702. Specifically, Plaintiff has not provided the Court with Mr. Soto's curriculum vitae or a list of his qualifications, education, training, experience, or publications. Accordingly, even if the Court could consider such extra-record materials, there is no basis for this Court to defer to Mr. Soto on technical issues relating to suction dredging. Since paragraph 9 and Exhibit 1 of the Soto Declaration are not necessary to establish standing, and are not appropriately part of the administrative record, the Court hereby GRANTS Defendants' request to STRIKE Paragraph 9 and Exhibit 1 of the Soto Declaration.

### 2. Paragraph 10 and Exhibit 2 of the Soto Declaration.

Defendants also argue that paragraph 10 and Exhibit 2 of the Soto Declaration should be stricken on the grounds that they contain, and depict, information that is outside of the administrative record. Defendants further argue that the information described in paragraph 10 and depicted in Exhibit 2 is not relevant to the instant litigation. In response, Plaintiff asserts that paragraph 10 and Exhibit 2 are relevant and admissible

United States District Court
For the Northern District of California

because they relate to Plaintiff's standing.

Plaintiff does not dispute, however, that Exhibit 2 contains four photographs of suction dredge mining that occurred on the Salmon River in August and September 2003 and that these activities are not challenged in the Second Amended Complaint.  Similarly, Plaintiff does not dispute that paragraph 10 of the Soto Declaration contains a description of certain mining activities, such as "highbanking," that have no relevance to this litigation.  Accordingly, the Court finds that paragraph 10 and Exhibit 2 are not necessary to establish Plaintiff's standing and may not be considered part of the administrative record.  Paragraph 10 and Exhibit 2 to the Soto Declaration are therefore STRICKEN from the record.

**B.      The Miners' Motion for Miscellaneous Relief Concerning the Record.**

**1.      Exhibit 2 to Plaintiff's Motion for Summary Judgment.**

In their separately filed Motion for Miscellaneous Relief Concerning the Record, the Miners first request that the Court strike Exhibit 2 to Plaintiff's Motion for Summary Judgment on the grounds that it is not properly part of the administrative record.  However, as the Miners concede, the exhibit, which is a December 2001 Draft Environmental Impact Statement relating to the Siskiyou National Forest (the "2001 Siskiyou Draft EIS"), is cited in a document entitled "Suction Dredge Literature Review as of December 6, 2004" that is currently part of the administrative record.  *See* AR 303.  Moreover, Defendants do not object to the inclusion of the 2001 Siskiyou Draft EIS in the administrative record and have stated that the document was omitted from the record only due to oversight.  Accordingly, the Court concludes that the document is properly part of the administrative record and the Miners' request to strike Exhibit 2 to Plaintiff's Motion for Summary Judgment is DENIED.

**2.      Exhibit 3 to Plaintiff's Motion for Summary Judgment.**

Second, the Miners request that the Court strike Exhibit 3 to Plaintiff's Motion for Summary Judgment, which is an April 24, 2000 letter from an Acting Forest Supervisor for the Rogue River and Siskiyou National Forests.  Since Plaintiff has conceded that Exhibit 3 should be withdrawn, the Court GRANTS Plaintiff's request to withdraw the document and Exhibit 3 to Plaintiff's Motion for Summary Judgment is hereby STRICKEN from the record.

**3.      References to *Siskiyou Regional Education Project v. Rose.***

18

1   Third, the Miners request that the Court ignore all of Plaintiff's references to the factual findings in

2   *Siskiyou Regional Education Project v. Rose*, 87 F.Supp.2d 1074 (D. Or. 1999).  Specifically, the Miners

3   argue that the factual findings in *Rose* must be ignored because that case was allowed to proceed without any

4   "input whatsoever from the Miners under circumstances the Miners regard as collusive."  The Court finds the

5   Miners' wholly speculative and unsupported assertions regarding the legitimacy of the Court's ultimate findings

6   in *Rose* inappropriate and unpersuasive.  However, the Court also recognizes that its review in the instant action

7   is limited to the administrative record that is properly before it, and may not include the factual findings of a

8   different district court in a separate proceeding that occurred outside of this jurisdiction.  Accordingly, the Court

9   sustains the Miners' objection on this basis, and has disregarded Plaintiff's references to the factual findings set

10  forth in the *Siskiyou* opinion.

11          **4.       Declarations of Soto and Hillman.**

12  Fourth, the Miners request that the Court "reject the Declarations of Soto and Hillman in their entirety

13  because no party to this litigation contests Plaintiff's standing."  However, as noted above, Plaintiff is permitted -

14  indeed *required* - to submit such declarations regardless of whether any party contests standing.  Moreover,

15  pursuant to Defendants' request, the Court has already stricken the portions of the Soto Declaration that exceed

16  Plaintiff's need to establish standing.  The Miners' request that the Court strike both declarations in their entirety

17  is therefore improper and unnecessary.  As such, the Court DENIES the Miners' request to strike the

18  Declarations of Soto and Hillman in their entirety.

19          **5.       Exhibits 1 and 2 to the Buchal Declaration.**

20  Fifth, the Miners seek to have the Court take judicial notice of the Forest Service Manual, which is

21  attached as Exhibit 1 to the Buchal Declaration, and the Forest Service Handbook, which is attached as Exhibit

22  2 to the Buchal Declaration.  The Miners argue that these documents should be considered by the Court

23  because the administrative record refers to the documents but does not include them.  The Miners further

24  contend that the parties do not object to the Court taking judicial notice of the documents.  Accordingly, the

25  Court hereby takes judicial notice of the Forest Service Manual and the Forest Service Handbook and has

26  considered them only to the extent that they are necessary to understand the Forest Service's actions.  *See*

27  *Southwest Center for Biological Diversity*, 100 F.3d at 1450 (allowing a court to consider extra-record

28

1  materials when it has been shown that the agency relied upon certain documents or materials not included in

2  the record).

3            **6.        Declarations of McCracken, Maria, and Greene.**

4            Sixth, the Miners seek to supplement the administrative record with the Declarations of David

5  McCracken,[13] Dennis Maria,[14] and Joseph Greene.[15]  The Miners argue that the Declarations of McCracken,

6  Maria, and Greene are necessary to: (1) further illuminate highly technical issues for the Court; (2) demonstrate

7  the adequacy of the Forest Service's consultations with Plaintiff; and (3) show "relevant" factors not

8  documented in the record.  The Miners also argue that the materials are necessary to "rebut" the Hillman and

9  Soto Declarations.  Defendants and Plaintiff object to the inclusion of these declarations in the record.

10           The Miners' attempt to supplement the administrative record with "rebuttal" declarations is

11 inappropriate.  Courts may not consider technical testimony elicited for the sole purpose of determining the

12 scientific merit of the agency's decision.  *Asarco, Inc.*, 616 F.2d at 1161.  The Court also may not consider

13 information created during the litigation "that was not available at the time the [agency] made its decision." *See,*

14 *e.g., Airport Cmty. Coalition*, 280 F.Supp.2d at 1213.  Accordingly, the Court STRIKES the Declarations

15 of McCracken, Maria, and Greene from the record.

16           **7.        California Department of Fish and Game Environmental Impact Reports and**
                         **Federal Environmental Impact Statement.**

17
18           Seventh, the Miners seek to supplement the administrative record with Exhibit 1 to the Maria

19 Declaration, which is a 1994 California Environmental Impact Report, and Exhibit 6 to the Buchal Declaration,

20 which is a federal Environmental Impact Statement that was prepared in connection with the initial promulgation

21 of the Part 228 mining regulations.  The Miners further argue that the Court should compel Defendants to

22 "complete" the administrative record by locating additional California Environmental Impact Reports and "such

23 other and further documents."  Plaintiff and Defendants object to the inclusion of these documents on the

24 _____

25           [13]David McCracken is the President and General Manager of the New 49er's, Inc.  McCracken Decl.
   at ¶ 1.

26           [14]Dennis Maria is a biologist formerly employed by the California Department of Fish and Game.
27 Maria Decl. at ¶¶ 2-3.

28           [15]Joseph Greene is a research biologist formerly employed by the United States Environmental
   Protection Agency.  Greene Decl. at ¶ 1.

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1  grounds that the documents were not considered by the agency in reaching the decisions challenged in the

2  instant lawsuit.  Plaintiff and Defendants also contend that the administrative record is complete and does not

3  need to be further supplemented.

4        The Court finds that the California Environmental Impact Report and the Environmental Impact

5  Statement for the Part 228 mining regulations are not necessary to determine whether the Forest Service

6  considered all relevant factors relating to its decision or to explain any technical terms or complex matters.

7  Further, the Court finds it highly relevant that the Defendants have expressly stated that the documents the

8  Miners seek to include were not considered by Forest Service.  Accordingly, the Court STRIKES Exhibit 1

9  to the Maria Declaration and Exhibit 6 to the Buchal Declaration from the record.

10        **8.**      **Process Predicament Report.**

11        Eighth, the Miners seek to supplement the record with a United Forest Service report called "The

12  Process Predicament," which is attached as Exhibit 3 to the Buchal Declaration.  The Miners, however, do not

13  even make a minimal attempt to show that this document is relevant to the instant analysis or that it should be

14  properly considered part of the administrative record under *Southwest Center for Biological Diversity.  Id.*

15  at 1450.  The Court therefore concludes that this document is entirely irrelevant to the Court's review and

16  STRIKES Exhibit 3 to the Buchal Declaration from the record.

17        **9.**      **Declaration of Thomas Kitchar.**

18        Ninth, the Miners request that the Court consider the Declaration of Thomas Kitchar, which is attached

19  as Exhibit 4 to the Declaration of James Buchal, as a "rebuttal" to Exhibit 2 to Plaintiff Motion for Summary

20  Judgment.  According to the Miners, the Kitchar Declaration "explains how the 'notice of intent' regulatory

21  scheme operated successfully for decades until local environmentalists and forest service officials joined

22  improperly forces in an extraordinary, bad-faith campaign against suction dredge mining."  Again, this document

23  does not fall within any of the four exceptions identified by the Ninth Circuit in  *Southwest Center for*

24  *Biological Diversity. Id.* at 1450.  Additionally, the Kitchar Declaration concerns a different case and matters

25  that are entirely outside of the scope of this litigation.  Accordingly, Exhibit 4 to the Buchal Declaration is

26  STRICKEN from the record.

27        **10.**      **Transcript from *California State Grange v. Dept. of Commerce.***

28

1  Last, the Miners seek to include the transcript from the proceedings in *California State Grange v.*

2  *Department of Commerce* in the administrative record.  The Miners, however, do not provide any rationale

3  for the Court as to why this document should be considered as part of the administrative record.  It does not

4  appear that any of the parties involved in the instant litigation were involved in the *California State Grange*

5  case.  Further, there is no evidence that the transcript, or the facts of the *California State Grange* case, were

6  considered by the Forest Service before making the decisions challenged here.  Therefore, the Court declines

7  to consider this document as part of the administrative record and, accordingly, the document is STRICKEN

8  from the record.

9  **II.    Plaintiff's Motion for Summary Judgment.**

10  **A.    Plaintiff's Standing.**

11  In order to maintain this action, Plaintiff must first establish that it has standing.  *See Lujan*, 504 U.S.

12  at 561 (noting that, at the summary judgment stage, a plaintiff "must set forth by affidavit or other evidence

13  specific facts" to demonstrate standing). "Article III of the Constitution limits the 'judicial power' of the United

14  States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian College v. Americans United*

15  *for Separation of Church & State*, 454 U.S. 464, 471 (1982) (citations omitted).  There are three

16  requirements for Article III standing: (1) an injury in fact, which means an invasion of a legally protected interest

17  that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal

18  relationship between the injury and the challenged conduct, which means that the injury fairly can be traced to

19  the challenged action of the defendants, and has not resulted from the independent action of some third party

20  not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, which means

21  that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative. *Lujan*,

22  504 U.S. at 560-61.  The party invoking federal jurisdiction bears the burden of establishing each of these

23  elements.  *Id.*

24  Here, neither Defendants nor the Miners contest Plaintiff's standing, and the Court concludes that

25  Plaintiff has adequately satisfied the requirements set forth in *Lujan*.  Specifically, Plaintiff has shown that it has

26  a reasonable belief that suction dredge mining and other mining operations occurring in and along the Klamath

27  River and its tributaries could impact the Tribe's ability to enjoy the spiritual, religious, subsistence, recreational,

28

22

**United States District Court**

For the Northern District of California

1   wildlife, and aesthetic qualities of the areas affected by the mining operations. Soto Decl. ¶¶ 6-7.  Accordingly,

2   any alleged failure of the Forest Service to properly regulate mining operations could directly and adversely

3   harm the Tribe and its members.  Hillman Decl. ¶¶ 6, 8.

**B.      Alleged Violations of the National Forest Management Act.**

5       In its Motion for Summary Judgment, Plaintiff first alleges that the Forest Service violated the National

6   Forest Management Act ("NFMA").

7       Pursuant to the NFMA, the Secretary of Agriculture has developed certain land and resource

8   management plans ["LRMPs"] for units of the National Forest System. 16 U.S.C. § 1604(a).  The LRMP

9   provides the overall management direction and general guidelines for the forest units for a period of up to 15

10  years. 16 U.S.C. § 1604(b).  The "plans . . . contain desired conditions, objectives, and guidance for project

11  and activity decision making in the plan area."  36 C.F.R. § 219.3.  However, the  "[p]lans do not grant,

12  withhold, or modify any contract, permit, or other legal instrument, subject anyone to civil or criminal liability,

13  or create any legal rights."  *Id.*  Any resource plans, permits, contracts, or other instruments for the use and

14  occupancy of National Forest System lands must be consistent with the LRMPs.  16 U.S.C. § 1604(i).  Here,

15  the relevant LRMPs are the Klamath National Forest Land and Resource Management Plan ("Klamath Forest

16  Plan") and the Northwest Forest Plan.

17      Plaintiff alleges that the Forest Service violated the NFMA by: (1) failing to require a PoO for all mining

18  operations occurring in RRs, regardless of whether those mining operations were likely to cause surface

19  resource disturbances; (2) failing to survey for and protect two sensitive species, the spring chinook salmon and

20  summer steelhead; and (3) failing to consult with the Karuk Tribe or to otherwise protect Tribal resources.

21  Because the NFMA does not authorize judicial review or create a private cause of action to enforce its

22  provisions, Plaintiff's claims are brought pursuant to the APA.  *Neighbors of Cuddy Mountain v. U.S. Forest*

23  *Service,* 137 F.3d 1372, 1377-38 (9th Cir. 1998).  Accordingly, the Court may set aside the Forest Service's

24  actions only if it finds that such actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in

25  accordance with law." *Citizens to Preserve Overton Park*, 401 U.S. at 416.  The Court finds that Plaintiff

26

27

28

has not made this showing.[16]

### 1.  Notices of Intent.

With regard to the first issue, Plaintiff asserts that Defendants violated standard MM-1 of the Northwest Forest Plan, which is incorporated into the Klamath Forest Plan as standard MA 10-34.  *See* AR017.  MA 10-34 reads as follows:

> Require a reclamation plan, approved Plan of Operations and reclamation bond for all minerals operations that include RRs.  Such plans and bonds must address the costs of removing facilities, equipment and materials; recontouring disturbed areas to near pre-mining topography; isolating and neutralizing or removing toxic or potentially toxic materials; salvage and replacement of topsoil; and seedbed preparation and revegetation to meet Aquatic Conservation Strategy objectives.

AR017.  Plaintiff argues that this provision is binding on the Forest Service and compels the Forest Service to require a PoO for every single mining operation occurring in the Klamath Forest, regardless of whether that mining operation is likely to involve a significant disturbance of surface resources.  Plaintiff further argues that MA 10-34 must be followed by the Forest Service because it has the force and effect of binding law.  Plaintiff's position, however, is wholly unsupported by the relevant factual and regulatory background.

As Defendants point out, MA 10-34 does not compel the Forest Service to require PoOs in RRs when the District Ranger has determined that a surface disturbance is not likely to occur.  Indeed, as Defendants argue, Plaintiff's narrow reading of the Klamath Forest Plan is untenable in light of the numerous regulatory and statutory provisions that apply to mining in national forests and  blatantly ignores the fact that, pursuant to the General Mining Law and 36 C.F.R. § 228, the Forest Service may not interfere with mining that is not likely to result in a significant disturbance of surface resources.  *See* 39 Fed. Reg. 31317 ("[The] [e]xercise of [the] right [to mine] may not be unreasonably restricted.").

Further, Plaintiff's assertion that the standards and guidelines have the "force and effect of binding law" is flatly contradicted by the explicit language in the Northwest Forest Plan.  Specifically, the Northwest Forest

---

[16]In their Opposition to Plaintiff's Motion for Summary Judgment, the Miners raise many of the same arguments set forth in Defendants' Opposition brief.  The arguments that are entirely duplicative of Defendants' arguments are not separately referred to herein.  The Court notes that the Miners have also argued that the NFMA does not apply to mining operations and that federal regulation of suction dredge mining is preempted by California's extensive regulatory regime.  However, since "[i]t is well settled that a court may not uphold an agency action on grounds not relied on by the agency," the Court declines to consider the Miners' additional arguments.  *See National R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 420 (1992).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Plan clearly provides that its standards and guidelines   "*do not apply where they would be contrary to existing law or regulation*, or where they would require the agencies to take actions for which they do not have authority." *See* Record of Decision for Northwest Forest Plan, Attachment A at A-6 (emphasis added). Indeed, the portion of the Northwest Forest Plan that discusses the intended force and effect of the standard and guidelines reads in its entirety:

> Designated areas, matrix, and Key Watershed all have specific management direction regarding how those lands are to be managed, including actions that are prohibited and descriptions of the conditions that should occur there.   This management direction is known as "standards and guidelines" – the rules and limits governing actions, and the principles specifying the environmental conditions or levels to be achieved and maintained.   Although the direction in all sections of this document constitutes standards and guidelines, standards and guidelines specific to particular land allocation categories [such as RRs], or relative to specific types of management activities, are included in Section C of these standards and guidelines.
>
> ***Additional direction to management agencies includes, but is not limited to directives, policy, handbooks, manuals, as wells as other plans, regulations, laws and treaties.***   The standards and guidelines presented here supersede other direction ***except treaties, laws, and regulations*** unless that direction is more restrictive or provides greater benefits to late-successional forest related species. ***These standards and guidelines do not apply where they would be contrary to existing law or regulation, or where they would require the agencies to take actions for which they do not have authority***.

*See id.* (emphasis added).[17]

Since MA 10-34 appears to require miners to submit a PoO in all instances, even when a significant disturbance of surface resources is not likely, and the Part 228 mining regulations permit a miner to proceed under an NOI when a significant disturbance of surface resources is not likely, MA 10-34 and the mining regulations are in conflict.   By the Plan's own terms, the mining regulations supersede the requirements of MA 10-34.[18]

---

[17]Standard 19-1 of the Plan also states that the Forest Service must "[a]dminister all locatable, leasable, and saleable mineral resource activities according to the 36 CFR 228 Regulations and other applicable laws, regulations and orders."   AR 012.   Although Plaintiff argues that this standard applies only to those areas outside of RRs, the standard is found in the section entitled "Management Direction - Forestwide" and thus "applies to all management areas, unless specifically excluded by the direction for that specific  management area."   *Id.*

[18]Plaintiff's argument that there is no "conflict" between MA 10-34 and the mining regulations because the requirement of a PoO is not an absolute "prohibition" on mining completely ignores the extensive regulatory history and discourse leading up to the promulgation of the Part 228 mining regulations.   *See* 39 Fed. Reg. 31317 (noting that the Forest Service "recognize[d] that prospectors and miners have a statutory right, not mere privilege, under the 1872 mining law and the Act of June 4, 1897, to go upon and use the open public domain lands of the National Forest System for the purposes of mineral exploration, development and production" and

United States District Court

For the Northern District of California

1  Plaintiff's sole response to this overwhelming evidence is the bare assertion that Defendants' position

2  does not deserve deference because the Forest Service has not consistently interpreted the Northwest Forest

3  Plan.  As a preliminary matter, even if this Court were to conclude that the Forest Service's interpretation of

4  the Northwest Forest Plan has been inconsistent, this would not necessitate a finding that the Forest Service's

5  actions were arbitrary or capricious.  *See Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d 1335, 1345 (9th

6  Cir. 1990) (holding that consistency is only "one relevant factor in judging [an agency's] reasonableness.").

7  While "the consistency of an agency's position is a factor in assessing the weight that position is due,"  *Good*

8  *Samaritan Hospital v. Shalala*, 508 U.S. 402, 417 (1993),  "[t]he fair measure of deference to an agency

9  administering its own statute has been understood to vary with circumstances, and courts have looked to the

10  degree of the agency's care, its consistency, formality, and relative expertness, and to [the] persuasiveness of

11  the agency's position." *United States v. Mead*, 533 U.S. 218, 228 (2001); *see also Skidmore v. Swift*, 323

12  U.S. 134, 139-40 (1944) ("The weight accorded [to an administrative] judgment in a particular case will

13  depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with

14  earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to

15  control.").

16  More importantly, however, the Court does not agree with Plaintiff that Defendants have been

17  inconsistent or arbitrary.  Plaintiff's sole "evidence" of inconsistency is its assertion that the Forest Service made

18  an abrupt "about-face regarding the Plan of Operations . . . requirement in Riparian Reserves" following the

19  District Court of Oregon's ruling in *Siskiyou Regional Education Project v. Rose*, 87 F.Supp.2d 1074 (D.

20  Or. 1999).  This argument is flawed for several reasons.  First and foremost, the *Siskiyou* opinion was issued

21  approximately five years ago and involved discrete areas within the Siskiyou forest in Oregon, not the Klamath

22  Forest in California.  It thus goes without saying that the facts and administrative record considered by the

23  *Siskiyou* court were different.  Further, the persuasiveness of the *Siskiyou* opinion is diminished considerably

24  in light of the fact that its analysis of the issues relevant to *this* litigation is extremely limited.  For example,

25  although the Forest Service apparently argued in *Siskiyou*, as it does here, that the standards and guidelines

26  of the Siskiyou National Forest Plan (the "Siskiyou Plan") were in conflict with the mining regulations, the

27

28  that the "[e]xercise of that right may not be unreasonably restricted").

26

**United States District Court**
For the Northern District of California

1    *Siskiyou* court ultimately concluded that the Forest Service's interpretation of the Siskiyou National Forest Plan

2    was "clearly erroneous and inconsistent with the plain language of the Standards and Guidelines." *Id.* 1087-

3    1088.  Inexplicably, however, the *Siskiyou* opinion has absolutely no analysis of the express provision in the

4    Northwest Forest Plan that states that standards and guidelines may not conflict with existing regulations.  Nor

5    does the *Siskiyou* opinion have any meaningful discussion regarding the inherent conflict between MM-1 and

6    36 C.F.R. § 228, or the Forest Service's position with respect to how to resolve the conflict.  In light of the fact

7    that the *Siskiyou* opinion does not address these issues, *which are at the very heart of this lawsuit*, this

8    Court declines to find the *Siskiyou* opinion persuasive or its holdings relevant.

9        Additionally, the *Siskiyou* opinion does not prove that the Forest Service has changed its position in

10   an arbitrary or capricious manner.  To the contrary, the fact that the Forest Service raised the same argument

11   it is relying upon here – that MM-1 cannot be followed due to its inherent conflict with the mining regulations

12   – proves just the opposite.

13       Further, the administrative record in this case demonstrates that Defendants have been anything but

14   inconsistent.  Significantly, Defendants first noted the conflict between the standards and guidelines of the

15   Klamath Forest Plan and 36 C.F.R. § 228 in 1995 – almost four years prior to the *Siskiyou* litigation.  Those

16   conclusions were set forth in a February 21, 1995 memorandum  almost immediately following the issuance

17   of the Record of Decision for the Northwest Forest Plan.  *See* AR 212-213.  The memorandum, which was

18   jointly issued by the Regional Foresters from the Pacific Northwest and Pacific Southwest Regions to all of the

19   Forest Supervisors, including the Forest Supervisor for the Klamath Forest, specifically recognized the inherent

20   conflict between the regulations governing the use of the surface of National Forest Lands in connection with

21   operations authorized by the United States mining laws (*i.e.* 36 C.F.R. 228, subpart A) and the standards and

22   guidelines applicable to Riparian Reserves.  AR 212.  The memorandum resolved the conflict by concluding

23   that the Forest Service may require a miner to submit a PoO only when the proposed mining operation is likely

24   to cause a significant disturbance of surface resources.  *See* AR 212 (concluding that "The mining S&G's within

25   the President's Plan for RR's and LSR's would therefore not apply because there is no regulatory provision for

26   including S&G's in an NOI.").

27       On January 30, 2002, the Deputy Chief for the National Forest System issued a directive that reiterated

28

the Forest Service's position with respect to the way the MM-1 is to be interpreted.  In the letter, the Deputy

Chief expressly stated that "[t]o apply . . . [the MM-1] standard and guideline to activities not meeting the 'likely

to cause significant surface disturbance' test is not appropriate and contrary to law and regulation.  If no

significant surface resource disturbance is occurring, [the Forest Service has] no reason to require a reclamation

bond, nor would [the Forest Service] be able to determine the bond amount." AR 214.   The letter concludes

by stating that the "MM-1 standard and guideline applies only when the proposed activity is likely to cause

significant surface disturbance.  This policy is consistent with Bureau of Land Management policy for lands they

manage, as well as the February 21, 1995, joint Regional Foresters' letter."  AR 215.

Significantly, the Deputy Chief's letter did not ignore the *Siskiyou* litigation, but specifically addressed

the outcome of the litigation as follows:

> Small-scale mining activity on the Siskiyou Forest has been suspended pending
> completion of a cumulative effects analysis.  The Forest Supervisor decided that
> numerous small scale ming activities occurring in the same area at the same time may
> likely cause significance [*sic*] surface disturbance, and that a forest-wide effects
> analysis should be completed to determine terms and condition[s] for conducting
> suction dredging.  A Draft Environmental Impact Statement for Suction Dredging
> Activities was released January 2001.  It is our expectation that, upon completion for
> this science based cumulative effects analysis, the Forest Supervisory may find that
> certain types and levels of activities may require a plan of operations ***and others
> may not***.

AR 215 (emphasis added).

On February 5, 2002, the Director of Minerals and Geology Management circulated a memorandum

to all Regional Foresters that summarized the Deputy Chief's findings and conclusions with respect to the MM-1

standard and guideline.  The memorandum stated:

> In the areas covered by the Northwest [Forest] Plan . . . or covered by other general
> management guidance or strategies, forest users can conduct non-significant surface
> disturbing activities without filing a plan of operations per the intent of the Forest
> Service Mining Regulations.  A Notice of Intent to Operate (NOI) will still be
> required if the proposed activity might cause disturbance of surface resources and
> it doesn't meet the provisions if 36 CFR 228.4(a)(2).  The MM-1 standard and
> guideline applies only when the proposed activity is likely to cause significant surface
> disturbance.  This policy is consistent with the Bureau of Land Management policy
> for lands they manage, and is consistent with both the February 21, 1995, joint
> Regional Foresters' letter, and a January 30, 2002 letter from Deputy Chief Tom
> Thompson[.]

AR 217.

In May 26, 2004, the Regional Forester for the Pacific Southwest Region circulated a memorandum

United States District Court

For the Northern District of California

1    to all Forest Supervisors that again "clarif[ied] the roles and responsibilities of the Forest Service for the

2    regulation of suction dredge mining activities that occur on national Forest System lands within Region 5."  AR

3    218 - AR 220.  The memorandum provided Forest Rangers with the following guidance:

> The District Ranger must [first] evaluate the [mining] operation as described in the Notice of Intent, including the environmental protection measures that are required through the state dredging permit and any other state or federal permits, and determine if there is likely to be significant disturbance of surface resources, thus requiring a more-detailed Plan of Operations.  Forests under the Northwest Forest Plan should be aware that the MM-1 standard and guideline (requiring a Plan of Operations for all mineral operations in riparian reserves) applies only when the proposed activity is likely to cause significant surface resource disturbance. . . .
>
> The District Ranger's evaluation of suction dredging Notice of Intent must consider all activities, proposed and reasonably foreseeable, in the waters and on the banks, including cumulative effects.  Suction dredging operations frequently involve incidental use and occupancy of the banks and shores for camping, fuel and equipment storage, campfires, and similar uses.  In fact, the on-shore activities may often present more concern for causing significant surface disturbance than the suction dredging operations.  The District Ranger cannot separate the on-shore from the in-water activities for the purpose of the evaluation of significant disturbance.
>
> The District Ranger's evaluation should define the thresholds or parameters within which suction dredging can occur without becoming a significant disturbance of surface resources.  By doing so, the District Ranger will be able to determine what type and level of operations can be conducted under a Notice of Intent, and which ones will require a Plan of Operations.  A Notice of Intent may suffice if the operator proposes to limit the hours of operation and to confine camping and other incidental uses to existing campgrounds or to a level that would not be likely to cause significant disturbance of surface resources.  District Rangers are therefore encouraged to discuss or communicate to operators the parameters for a Notice of Intent prior to submittal[].

AR 219.

Based on the foregoing evidence in the administrative record, the Court concludes that the Forest Service has consistently, and reasonably, interpreted the Northwest Forest Plan and Klamath Forest Plan to address the inherent conflict between the mining regulations and the Northwest Forest Plan.  In fact, the weight of the evidence supports a finding that the Forest Service has exercised considerable care in achieving the correct balance between the guidelines of the Forest Plan, on one hand, and the mandates of the relevant mining statutes and regulations, on the other.

### 2.    Threatened and Endangered Species and Tribal Consultation and Protection of Tribal Resources.

Plaintiff has also not shown that the Forest Service's acceptance of the four NOIs challenged in this

1   litigation violated any other provisions within the Klamath Forest Plan, including: (1) standard 8-3, which

2   requires the Forest Service to "[r]eview all Forest Service planned, funded, executed or permitted programs

3   and activities for possible effects on TE&S [threatened and endangered] species"; (2) standard 6-8, which

4   provides that "[p]roject areas should be surveyed for the presence of Sensitive species before project

5   implementation [and] . . . assessed for the presence and condition of Sensitive species habitat [if surveys cannot

6   be conducted]"; (3) standard 8-18, which requires the Forest Service to "[a]void or minimize impacts to

7   Sensitive species where possible"; (4) standard 24-24, which requires the Forest Service to provide for Native

8   American needs for collection and/or use of traditional resources; or (5) standard 24-27, which requires the

9   Forest Service to consult and coordinate with the Tribe on all projects that have the potential to affect Native

10  American values.  *See* AR 006, AR 009-010.

11      First, the Forest Service's duty, under the NFMA, to comply with these standards in the Klamath

12  Forest Plan is not triggered by the NOI process because the Forest Service's receipt of an NOI is not a federal

13  project or a "permit[], contract[], [or] other instrument for the use and occupancy of the National Forest

14  System lands."  *See* 16 U.S.C. § 1604(i) (providing that "[r]esource plans and permits, contract, and other

15  instruments for the use and occupancy of National Forest System lands shall be consistent with the land

16  management plans.").  Moreover, even if the NFMA did apply, the administrative record demonstrates that

17  the Forest Service fulfilled its obligations under standards 8-3, 6-8, 8-18, 24-24, and 24-27.  Specifically, the

18  administrative record shows that the Happy Camp Ranger developed an extensive series of recommendations

19  to provide better protection for fisheries, including sensitive species.  *See* AR 097-100.  The record also shows

20  that Defendants consulted with members of the Karuk Tribe, responded to the Tribe's concerns, conducted

21  several meetings with Karuk Tribe members and others, and directly engaged the Tribe in suction dredge

22  compliance monitoring activities.  *See* AR 041, AR 106, AR 109, AR 381-83, and AR 384-91.

23      Accordingly, with respect to its NFMA allegations, Plaintiff has failed to establish that it is entitled to

24  judgment as a matter of law, and therefore Plaintiff's motion for summary judgment on its NFMA claim is

25  DENIED.

26      **B.      Alleged Violations of the National Environmental Protection Act.**

27      Plaintiff has also not shown that Defendants violated the National Environmental Protection Act

28

United States District Court

For the Northern District of California

("NEPA"). Plaintiff's specific assertion is that Defendants violated NEPA by failing to prepare an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") before allowing mining to proceed under the four NOIs challenged in this action.

NEPA, 42 U.S.C. §§ 4321-4370f, requires the preparation of a detailed EIS for all "major [f]ederal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2). Should the agency determine that there is a federal action, but that the federal action does not significantly affect the quality of the human environment, the agency's analysis may take the form of an EA. *See* 40 C.F.R. § 1501.4(c)-(e). Thus, the most important threshold question is whether the action falls within NEPA in the first place. *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C.Cir.2001); *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1133 (5th Cir.1992). If there is no "major federal action," that is the end of the inquiry; the agency need not prepare an EIS or EA. *Citizens Against Rails-to-Trails*, 267 F.3d at 1151.

As Defendants correctly note, Plaintiff's belief that NEPA applies to the NOI process is in direct conflict with the Ninth Circuit's holding in *Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988). In *Penfold*, the Ninth Circuit analyzed the Bureau of Land Management's ("BLM") processing of "notice mines"[19] and concluded that the BLM's review of notice mining did not amount to a "major federal action" triggering NEPA compliance. *Id.* at 1313. Significantly, the Ninth Circuit reached this conclusion even after observing that: (1) the BLM's involvement in reviewing the notices was extensive; (2) the BLM was required to, and did, conduct compliance inspections of the notice mining; (3) the BLM was responsible for promulgating the regulations relating to notice mining; and (4) the BLM issued letters indicating that the notice mining was "approved." *Id. at 1314*. Specifically, the Ninth Circuit held that "[n]either BLM's approval process nor regulatory involvement is sufficient to trigger NEPA . . . application." *Id.*

Plaintiff nevertheless argues that the holding in *Penfold* is inapposite because the Ninth Circuit's holding in *Penfold* was premised entirely on the fact that the BLM was not vested with any "discretion" to deny notice

---

[19]According to the BLM's placer mining regulations, "notice" mine is a mining operation relating to alluvial or glacial deposits of gold that "causes a cumulative surface disturbance of five acres or less per year." 43 C.F.R. § 3809.1-3(a).

31

United States District Court

For the Northern District of California

1   mining due to the regulation's "categorical 5-acre cutoff rule."[20]  Plaintiff's attempt to distinguish *Penfold* might

2   be persuasive if this were actually the holding of *Penfold*.  But it is not.  *See Penfold*, 857 F.2d at 1314

3   (concluding only that notice mining is not a major federal action because "[n]otice mine operators [do not]

4   receive federal funding . . . [and] BLM cannot require approval before an operation can commence developing

5   the mine"); *see also Mineral Policy Ctr. v. Norton*, 292 F.Supp.2d 30 (D.D.C. 2003) (agreeing with the

6   district court in *Sierra Club v. Penfold* that notice mining is merely "the basis for limited enforcement review

7   . . to target the distribution of information" and that the notices are "ministerial reminder[s] . . . [that] encourage

8   miners to comply with their legal responsibilities.").

9        Although the Court is cognizant of the fact that *Penfold* concerns placer mining, rather than the specific

10  type of mining and mining regulations at issue here, the Court finds that *Penfold* is sufficiently analogous to the

11  instant case such that the holding of *Penfold* is controlling.  Thus, pursuant to *Penfold*, the Court finds that the

12  Forest Service's acceptance of the four NOIs was not a "federal action" that triggered NEPA.  Accordingly,

13  Plaintiff's motion for summary judgment with respect to its NEPA cause of action is DENIED.

14        **C.     Alleged Violations of the Endangered Species Act.**

15        Finally, the Court finds that Plaintiff has not demonstrated that Defendants violated the Endangered

16  Species Act ("ESA") by failing to comply with ESA's Section 7 consultation requirements.     Section 7(a)(2)

17  of the ESA requires all federal agencies "to insure that any action authorized, funded, or carried out by such

18  agency is not likely to jeopardize the continued existence" of any endangered or threatened species or result

19  in the destruction of critical habitats. 16 U.S.C. § 1536(a)(2). Under the applicable regulations, a "federal

20  action" includes activities or programs of any kind authorized, funded, or carried out, in whole or in part, by

21  federal agencies, such as: (a) actions intended to conserve listed species or their habitat; (b) the promulgation

22  of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid;

23  or (d) actions directly or indirectly causing modifications to the land, water, or air. 50 C.F.R. § 402.02.  If an

24  agency determines that its proposed action "may affect" an endangered or threatened species, the agency must

25  formally consult with the Fish and Wildlife Service and/or the National Marine Fisheries Service, depending

26

27  ───────────────

28      [20]Tellingly, Plaintiff does not support this statement with any actual citations to *Penfold*.  That is because this "holding" does not appear anywhere in the *Penfold* opinion.

United States District Court

For the Northern District of California

1    on the species that are protected in the area of the proposed action. *See Pacific Rivers Council v. Thomas*,

2    30 F.3d 1050, 1054 n. 8 (9th Cir.1994).  "Section 7 and [its] requirements . . . apply to all actions where there

3    is discretionary [f]ederal involvement and control."  50 C.F.R. § 402.03.  Judicial review of administrative

4    decisions involving the ESA is governed by section 706 of the APA.

5          Plaintiff argues that the Forest Service's review of an NOI constitutes an "authorization" of that mining

6    operation and thus is a "federal action" within the meaning of the ESA.  In response, Defendants maintain that

7    the only mining operations that are "authorized" by the Forest Service are those operations that are proceeding

8    under a PoO.  Consequently, Defendants contend that the ESA is not triggered by the NOI review process

9    because the review process is not a "federal action."[21]  Accordingly, with respect to Plaintiff's allegations under

10   the ESA, the critical question is this: Is the Forest Service's determination that a mining operation is not likely

11   to cause a significant disturbance of surface resources an "authorization" of the subsequent mining activities such

12   that the entire NOI review process constitutes a "federal action" within the meaning of the ESA?

13         The Court finds that the answer to this question is "No" for several reasons.  First, neither party disputes

14   that the miners, who are all private entities, are the ones carrying out the mining operations described in the

15   NOI.  This factor, though not dispositive, weighs in favor of a finding that the activity is "private" and not

16   "federal." Second, the Ninth Circuit's holding in *Penfold* makes clear that a federal agency's *review* of mining

17   "notices" is not a "federal action" within the meaning of NEPA.  Although this factor is also not necessarily

18   dispositive with respect to an ESA claim, it weighs heavily in favor of a finding that the Forest Service's does

19   not "authorize" an NOI merely by reviewing it and, thus, the NOI review process, in and of itself, is not a

20   "federal action."  *See Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1996) (finding that the

21   standards for "major federal action," under NEPA, and "agency action," under the ESA, are much the same,

22

23   _____

24         [21]The Miners raise this same argument in their Opposition brief.  Additionally, the Miners argue that
     the ESA does not apply to this case because the listing of the Southern Oregon/Northern California (SONC)
25   coho salmon as a threatened species is invalid.  However, Defendants have conceded that the coho listing is
     currently still in effect and still valid.  Thus, the Court declines to consider this argument.  The Court also finds
26   unpersuasive the Miners' alternative argument that Plaintiff's ESA claim fails because Plaintiff "offers no
     evidence that any listed species were present during any mining operations conducted with the [four] challenged
27   notices of intent."  The correct standard under the ESA is whether a federal action "may affect" the listed
     species.  *Pacific Coast Fed. v. Bureau of Reclamation*, 138 F.Supp.2d 1228, 1240-41 (N.D. Cal. 2001).
28   Plaintiff does not need to prove actual harm to the species.  *Id.*

33

United States District Court

For the Northern District of California

1  though acknowledging that the NEPA standard may be more broad).[22]  This is further strengthened by the fact

2  that the Forest Service has only fifteen days within which it must review the NOI and inform the operator

3  whether a PoO will be required.  36 C.F.R. § 228.4(a)(2)(iii).

4      Third, Plaintiff's argument utterly ignores the fact that mining operations take place pursuant to the

5  General Mining Law and the Surface Resources Act, which confers a statutory right upon miners to enter

6  certain public lands for the purpose of mining and prospecting.  This distinction is significant, as it differentiates

7  mining operations from "licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid," which

8  are permissive in nature.  Last, Plaintiff has not identified any sufficiently analogous case law that supports its

9  argument that the Forest Service's "discretion" to determine what constitutes a "significant surface resource

10  disturbance" is the type of "discretionary control" over the NOI process that invokes the ESA.

11     In fact, although Plaintiff vigorously argues that any act requiring "discretion" invokes the ESA, it is well-

12  established that not every agency action triggers the consultation requirement of Section 7(a)(2) of the ESA.

13  As the Ninth Circuit has made clear:

> Within the limits prescribed by the Constitution, Congress undoubtedly has the
> power to regulate all conduct capable of harming protected species.  However,
> Congress chose to apply section 7(a)(2) to federal relationships with private entities
> ***only when the federal agency acts to authorize, fund, or carry out the
> relevant activity***.

17  *Sierra Club v. Babbitt*, 65 F.3d 1502, 1508 (9th Cir. 1995) (emphasis added).

18     Plaintiff's reliance on *Turtle Island Restoration Network v. National Marine Fisheries Service*, 340

19  F.3d 969 (9th Cir. 2003) does not compel a different conclusion.  Although *Turtle Island* does stand for the

20  general proposition that "Section 7 and the requirements of this part apply to all actions in which there is

21  discretionary Federal involvement or control," *id.* at 975, the discretionary involvement and control in *Turtle*

22

23  ───────────────

24  [22]Contrary to Plaintiff's assertion, *United States v. Weiss,* 642 F.2d 296 (9th Cir. 1981) does not
    support Plaintiff's position.  *Weiss* states that "[u]nder the [Forest Service mining] regulations, the Forest

25  Service must be notified of any mining-related operation that is likely to cause a disturbance of surface
    resources.  The initiation or continuation of such operation is subject to the approval of the Forest Service."

26  *Weiss*, 642 F.2d at 297.  Since Defendants do not dispute that mining operations likely to cause a disturbance
    of surface resources must be approved by the Forest Service, *Weiss* is consistent with Defendants' position.
    Plaintiff, however, unjustifiably reads this second sentence as stating: "The initiation or continuation of [*any*

27  *mining operation, even those that are not likely to cause a significant disturbance of surface resources*]
    is subject to the approval of the Forest Service."  This is not what *Weiss* actually says, and the Court declines

28  to adopt Plaintiff's contorted reading of the case.

34

United States District Court

For the Northern District of California

1    *Island* arose out of the agency's responsibilities under the Compliance Act to regulate and authorize fishing

2    operations.[23]  *Id.* at 973.  Thus, the discretion retained by the agency in *Turtle Island* is closely analogous to

3    the discretion retained by the Forest Service when approving a PoO; however, the facts in *Turtle Island* are

4    not analogous to the NOI review process.

5           For the same reasons, *Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) is also

6    inapposite.  In *Pacific Rivers Council*, the Ninth Circuit concluded that a forest's land resource management

7    plan ("LRMP") is an "continuing agency" action within the meaning of the ESA.  *Id.* at 1056.  The *Pacific*

8    *Rivers Council* opinion squarely addresses projects that are "planned" and "implemented" by the Forest

9    Service pursuant to the LRMP, such as timber sales, range activities, grazing permits, and road building

10   projects.  *Id.* at 1053.  Arguably, a PoO would fall within this description, and indeed, Defendants do not

11   dispute that it does.  But Plaintiff has not demonstrated that the *Pacific Rivers Council* holding extends to the

12   NOI process, which merely provides the Forest Service with notice of activities occurring pursuant to the

13   General Mining Law.  Indeed, in *Environmental Prot. Info. Ctr. v. Simpson Timber*, 255 F.3d 1073, 1081

14   (9th Cir. 2001), the Ninth Circuit declined to follow *Pacific Rivers Council*, even though the action challenged

15   under the ESA involved the Forest Agency's continuing administration of a logging permit issued to a private

16   person.  *Id.* at 1080 ("The Forest Service has plenary control [over its LRMPs] because it is the agency

17   charged with promulgating, approving, and implementing LRMPs on Forest Service land.  In contrast,

18   Simpson's . . . permit, like the right-of-way agreement in *Sierra Club*, involves agency authorization of a private

19   action and a more limited role for the [Forest Service].").

20          Finally, pursuant to *Marbled Murrelet*, the Court finds that Plaintiff's generalized challenge to the

21   "discretionary" nature of the Forest Service's implementation of the NOI review process is insufficient to invoke

22   the ESA.  Although, here, the Forest Service engaged in an interactive process with the miners prior to the start

23   of the 2004 mining season, which process involved a discussion of the types of activities that would be

24   considered a significant disturbance of surface resources, this process is most properly considered the type

25   of "advisory" conduct that does not trigger the ESA.  *Marbled Murrelet*, 83 F.3d. at 1074.  Indeed, as the

26

27   _____

28          [23]The Compliance Act requires "United States vessels to obtain permits [from the National Marine
     Fisheries Service before they] engage in fishing operations on the high seas."  16 U.S.C. §§ 5504-5506.

35

United States District Court

For the Northern District of California

1    Ninth Circuit stated in *Marbled Murrelet*:

> Protection of endangered species would not be enhanced by a rule which would require a federal agency to perform the burdensome procedural tasks mandated by section 7 [of the ESA] simply because it advised or consulted with a private party. Such a rule would be a disincentive for the agency to give such advice or consultation. Moreover, private parties who wanted advice on how to comply with the ESA would be loathe to contact the [agency] for fear of triggering burdensome bureaucratic procedures. As a result, desirable communication between private entities and federal agencies on how to comply with the ESA would be stifled, and protection of threatened and endangered species would suffer.

*Id.* at 1074-75.

Here, Plaintiff has not established that the NOIs are "permits" that are "authorized" by the Forest Service. Nor has Plaintiff established that the Forest Service's initial consultation process with the miners is a federal action that triggers the ESA. Thus, while the Court is sensitive to the fact that the ESA is broadly construed, Plaintiff has simply not demonstrated that the statute is so broad as to encompass activities – such as the NOI review process– where the only federal involvement is (1) the agency's internal policy determinations with respect to the parameters of the review process; and (2) the review process itself. Significantly, were the Court to adopt Plaintiff's reading of the ESA, it would essentially eviscerate any meaningful distinction between the NOI and the PoO processes whatsoever. Thus, the Court does not find that Defendants' actions were arbitrary, capricious, or contrary to law, and therefore DENIES Plaintiff's motion for summary judgment on its ESA cause of action.

## **CONCLUSION**

Based on the foregoing, IT IS HEREBY ORDERED AS FOLLOWS:

1.   Plaintiff's fifth, sixth, and eighth causes of action are DISMISSED WITHOUT PREJUDICE;

2.   Defendants' Motion to Strike Portions of Plaintiff's Declaration of Toz Soto [Docket No. 59] is GRANTED;

3.   The Miners' Motion for Miscellaneous Relief Concerning the Record [Docket No. 65] is GRANTED IN PART AND DENIED IN PART; and

4.   Plaintiff's Motion for Summary Judgment [Docket No. 54] is DENIED.

IT IS SO ORDERED.

 s/Saundra Brown Armstrong

1    Dated: 7/1/05                              SAUNDRA BROWN ARMSTRONG
                                                United States District Judge
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California